UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KAREN REILLY,

                    Plaintiff,              04-CV-6423T

v.                                          DECISION
                                            and ORDER

JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

_____


                         INTRODUCTION

     Plaintiff, Karen Reilly ("Reilly") filed this action

pursuant to the Social Security Act, codified at 42 U.S.C. §§

405(g) and 1383(c)(3), seeking review of a final decision of the

Commissioner of Social Security ("Commissioner"), denying her

application for Disability Insurance Benefits ("Disability"), and

Supplemental Security Insurance ("SSI").  On March 1, 2005 the

Commissioner moved for summary judgment.  On April 29, 2005,

plaintiff cross-moved for judgment on the pleadings pursuant to

Rule 12(c) of the Federal Rules of Civil Procedure.

     For the reasons that follow, this Court finds that the

Commissioner's decision is supported by substantial evidence.

Accordingly, plaintiff's motion for judgment on the pleadings is

denied and defendant's motion for judgment on the pleadings is

granted.

BACKGROUND

Plaintiff is a 55 year old woman with a college education. (Tr. 288) She alleges that she has been disabled since January 25, 2001 because of a sprain to her cervical spine which she suffered in an automobile accident. (Tr. 56) On September 25, 2002 plaintiff filed an application for SSI benefits. (Tr. 38-40) The application was denied by Notice dated January 16, 2003. (Tr. 31-34)  Plaintiff requested a hearing which was held on May 19, 2004 at which plaintiff appeared represented by an attorney and testified.  By decision dated June 14, 2004, the Administrative Law Judge ("ALJ") found Reilly was not disabled because she could return to her past relevant work as a telephone sales representative, collections clerk and leasing agent. (Tr. 21) Plaintiff requested review by the Appeals Council and the decision of the ALJ became final when the Appeals Council denied review on August 5, 2004. (Tr. 5-7).  Plaintiff commenced this action on October September 2, 2004.

A.   Medical Background

 Plaintiff was in a motor vehicle accident on January 25, 2001 when the car she was driving was struck from behind by a sports utility vehicle.  Plaintiff stated that within 15 minutes of the accident she developed significant posterior headaches, neck stiffness and nausea but she was able to drive her own vehicle home. (Tr. 101)  By the next morning, plaintiff claimed

2

that she could not turn her head at all because of increased neck pain, stiffness and headaches.  She saw her primary care physician, Dr. Robert Thomson, who diagnosed cervical sprain/whiplash and prescribed pain medication. (Tr. 101) Within one week Reilly began to develop tingling in the fingers of both hands.  Dr. Howard Lesser, an electromyographer, examined plaintiff on March 2, 2001, finding that plaintiff had some pain with turning the head but had normal strength in the upper extremities. (Tr. 95) Plaintiff had no arm numbness and no radicular discomfort with cough or sneeze yet Reilly complained of neck pain. (Tr. 95) An MRI of the cervical spine of February 9, 2001 was "entirely normal". (Tr. 95) Dr. Lesser recommended physical therapy. (Tr. 96)

Plaintiff was examined by Dr. Thomson on March 23, 2001 by which time her progress in physical therapy had ceased. (Tr. 157) Plaintiff's rotation of the neck was 10 to 15 degrees and her extension was limited to 5 to 10 degrees as was flexion. (Tr. 157) There was tenderness directly over the mid cervical spine. Plaintiff's hand grip was observed at "5 out of 5." (Tr. 157)

Dr. Thomson examined plaintiff on April 17, 2001 at which time plaintiff reported that she was experiencing modest improvement. (Tr. 156) Dr. Thomson increased the prescribed dosage of Neurontin and referred plaintiff to the Pain Treatment Center. (Tr. 156)

3

Plaintiff was treated at the Viahealth Rocester General Hospital Pain and Symptom Management Center for treatment of neck pain.  During his initial evaluation on May 14, 2001, Dr. Robert Thomson reported that Reilly indicated that she was having episodic paresthesias throughout digits four and five of both hands which she characterized as throbbing, sharp tender and shooting. (Tr. 82, 155)  She claimed that she was awakened several times at night from pain and that her pain was aggravated by extending her neck. (Tr. 82)  She obtained some relief by flexing her neck forward and applying heat. (Tr. 82) At this time, plaintiff was not taking any pain medications.

Dr. Thomson examined plaintiff on June 22, 2001 for chronic neck pain. (Tr. 154) An examination revealed that plaintiff could extend the neck to 15 degrees, rotate to 45 degrees to the right and 30 degrees to the left and can flex the neck with the chin tuck.  There was pain over the middle to upper cervical spine. (Tr. 154)

Plaintiff was next evaluated at the Pain and Symptom Management Center on June 22, 2001 by Dr. Ajai Nemani. (Tr. 81) During this evaluation, plaintiff reported that medications had "significantly improved" the pain. (Tr. 81) However, she did claim that the amitriptyline caused her some drowsiness and that the Vioxx caused some gastrointestinal dyspepsia.  The Vioxx had been discontinued in response to plaintiff's concerns and was

4

replaced by Celebrex but now plaintiff asked to go back on the
Vioxx.  Plaintiff's examination showed her to be otherwise
healthy with no signs of tenderness over the C2 spine's process.
(Tr. 81) There were no motor or sensory abnormalities in either
upper extremity. (Tr. 81) Dr. Nemani recommended a continuation
of the medication with some modifications.  If this plan did not
provide plaintiff with enough relief, he recommended greater
occipital nerve blocks. (Tr. 81)

Plaintiff continued to experience headaches despite the
medications.  Therefore, Dr. Nemani treated plaintiff with
occipital nerve block on July 18, 2001. (Tr. 76, 80) During a
follow-up examination on August 23, 2001, plaintiff reported to
Dr. Nemani that the shot made her pain dramatically worse.  (Tr.
76) She claimed that the nerve block caused her to have a
constant headache for two weeks following the procedure.  Dr.
Nemani expressed that he did not know "what to make of her
reaction" to the procedure but did note that Reilly had extreme
fear of the procedure.  Dr. Nemani recommended a few more
medications for her to try including Trileptal. (Tr. 76) If she
did not respond favorably, he did not have anything else to offer
the pain. (Tr. 76) Plaintiff returned for two subsequent visits
in October and November of 2001 at which time Reilly claimed that
she could not tolerate Trileptal and that she did not want to try
further medications. (Tr. 74) Dr. Nemani concluded that there was

no further need to see Reilly unless she wished to be seen again. (Tr. 74)

Plaintiff was examined by Dr. Thomson on October 1, 2001 for cervicalgia. (Tr. 153) Plaintiff claimed to have experienced "significant increase in neck pain" on the drive to the doctor's office and stated that she could not play the piano for more than 20 minutes at a time. (Tr. 153) She had an occipital block at the pain center which she claimed caused an increase in her pain. Plaintiff believed that Skelaxin helped modestly.  Dr. Thomson noted 15 degrees of rotation to either side and that extension and flexion were limited to 15 degrees each. (Tr. 153) He adjusted plaintiff's medications to discontinue Vioxx and Imipramine but to take Trileptal, Celebrex, Evista and to continue with physical therapy.  On November 20, 2001, Dr. Thomson prescribed the use of a TENS unit and physical therapy "due to whiplash". (Tr. 97-98)

Reilly had a cervical evaluation at Plaza Sports Medicine and Rehabilitation Center on November 7, 2001. (Tr. 90-91) Plaintiff noted that she experienced headaches and back pain which were relieved when she bent forward but was aggravated by turning. (Tr. 90) Reilly went for therapy on November 14th and November 29th. (Tr. 89) She cancelled appointments on December 5th and January 2nd. (Tr. 88) Reilly did go to an appointment with the rehabilitation center on December 13, 2001 during which

6

she mentioned that she believes the TENs unit was working and
that she was not comfortable with physical therapy. (Tr. 86) On
February 13, 2002, Plaza Sports Medicine and Rehabilitation
Center sent a notice to Dr. Thomson that Reilly was discharged
because she had not been treated or called for an appointment for
more than four weeks. (Tr. 85)

Dr. Thomson examined plaintiff on December 18, 2001 at which
time plaintiff reported that she was better and that her
headaches were not lasting as long. (Tr. 152) She was using the
TENS Unit, having mild physical therapy and taking Imipramine.
Plaintiff did note that bending caused headaches. (Tr. 152) Dr.
Thomson noted that plaintiff would be out of work on a continuing
basis due to continuing neck pain.  He renewed her physical
therapy and noted that he saw slow improvement. (Tr. 152)

Plaintiff was next examined by Dr. Thomson on March 15, 2002
at which time plaintiff reported that she was enjoying more days
free of headaches than she was three months prior, however,
activity caused headaches to recur. (Tr. 151) Reilly reported
that Skelaxin was not helping and she was not going to physical
therapy. (Tr. 151) Dr. Thomson noted at that time that
plaintiff's range of motion had improved and she was able to flex
her neck more. (Tr. 151) Extension was extremely limited and
rotation to either side was 45 degrees to the right and 30
degrees to the left. (Tr. 151) Dr. Thomson reported that he saw

7

"very modest" improvement since the motor vehicle accident.
Because Skelaxin did not help, he prescribed Robaxin on a trial
basis. (Tr. 151)

By letter dated April 23, 2002, Dr. Louis Medved, a
neurologist, provided his complete independent medical
examination summary of plaintiff. (Tr. 101-106)  Dr. Medved
reported that Reilly's complaints at the time of the examination
included posterior headaches which remain mild until she
increased her activity or bends over. (Tr. 102) Reilly complained
of neck pain, decreased range of motion and shoulder tightness.
She also experienced tingling in the fourth and fifth fingers.
(Tr. 102)

Upon examination, plaintiff had significant occipital
tenderness to palpation and performed 60 degrees of right lateral
rotation, 20 degrees to the left, full flexion and no extension.
(Tr. 102) Range of motion of the left shoulder was diminished to
110 degrees of abduction and 135 degrees of forward flexion on
the basis of pain. (Tr. 102-103) Right shoulder range of motion
was full.  Right hand grip was diminished as plaintiff exhibited
giveaway pain when testing of the left upper extremity muscles.
(Tr. 103)

Dr. Medved diagnosed plaintiff with cervicalgia relating to
cervical strain or whiplash.  Also, plaintiff had chronic
headaches on a posttraumatic basis as well as relating to

8

cervical strain. (Tr. 104) He opined that plaintiff's prognosis was poor given that 15 months had elapsed since the motor vehicle accident and she remained symptomatic without response to appropriate treatment. (Tr. 105) He concluded that plaintiff sustained a permanent impairment.  Dr. Medved found significant decrease in range of motion of the neck in addition to neck pain and headaches.  Therefore, he recommended that plaintiff be restricted from any prolonged positioning of the neck, especially extension. (Tr. 105) She could not perform overhead work or repetitive reading at the shoulders.  She should lift no more than 15 pounds on an occasional basis.  He found that plaintiff could, however, perform her regular duties that she was performing prior to the accident. (Tr. 105) Dr. Medved noted that some of plaintiff's shoulder injuries preexisted the motor vehicle accident.  He found that her condition had stabilized and that no further treatment was indicated. (Tr. 105)

Dr. Thomson reported on May 21, 2002 that plaintiff noted that she experienced headaches even when doing simple chores about her own home. (Tr. 94) Reilly was taking Xanax, Maxair, Celbrex, Evista, Imipramine, Robaxin and Paxil as well as undergoing physical therapy with a TENS unit. (Tr. 94) Dr. Thomson noted that Reilly's diagnosis of cervicalgia continued and that she was totally disabled since the motor vehicle accident in January, 2001. (Tr. 94, 150)

9

By letter dated June 27, 2002, Dr. Louis Medved provided an addendum to his independent medical examination of Reilly having been provided additional medical reports. (Tr. 99-100) First, Dr. Medved reviewed Dr. Thomson's report that plaintiff had mildly weak right hand grasp, experienced headaches when performing daily housekeeping chores, and that her range of motion of the neck was limited on the basis of pain.  Dr. Thomson opined that plaintiff had cervicalgia and anxiety states and was unable to return to work. (Tr. 99) Dr. Medved found that Dr. Thomson's determination was based on plaintiff's subjective complaints. Based on objective findings, Dr. Medved maintained that Reilly did have a partial disability and that her reported symptoms and complaints are "out of proportion to the nature of the motor vehicle accident and the objective findings". (Tr. 100)

Dr. Thomson examined plaintiff for Carpal Tunnel Syndrome on October 1, 2002. (Tr. 147) During this exam, plaintiff claimed that she had rushed to clean her apartment and had experienced numbness and tingling in the hands.  She claimed that she had some tingling into both hands since the accident but that there was no loss of strength. (Tr. 147) Dr. Thomson prescribed Celexa and recommended trying a wrist splint. (Tr. 147) Dr. Thomson again examined plaintiff on October 8, 2002 for numbness that persisted for three weeks associated with pain which awakened Reilly at night. (Tr. 107) At this time, he referred plaintiff to

10

a neurologist, Dr. Andrew Stern, for neuralgia, neuritis and radiculitis. (Tr. 107)

Dr. James Tacci performed an independent medical evaluation of plaintiff on December 20, 2002. (Tr. 108-114) At this time, Dr. Tacci noted that plaintiff was taking Xanax and Benadryl but was not taking Celebrex, Laxapro, Robaxina nd Evista because she could not afford them. (Tr. 109) Dr. Tacci noted that Reilly was able to drive herself to the appointment and that she did not bring a cane with her for ambulation. (Tr. 110) Plaintiff reported difficulty walking and climbing stairs because of a knee injury. (Tr. 110) Plaintiff claimed that she was able to cook, clean, do laundry, shop, shower and dress herself. (Tr. 110)

Plaintiff appeared to have a normal gait and was able to perform 20% of a full squat because of subjectively reported knee pain and neck pain. (Tr. 111-112) Plaintiff did not need help changing for the exam nor to get on and off the exam table.

Reilly's cervical spine exam showed decreased range of motion.  Dr. Tacci found that this limitation was secondary to "subjectively reported neck pain which was not accompanied by any palpable objective spasm of the cervical spine or shoulder muscles." (Tr. 112) Cervical spine flexion was normal but extension was limited to 20 degrees. (Tr. 112) Cervical spine rotation was limited to 60 degrees on the right and 40 degrees on the left.   Lateral flexion was normal.  Through all of the range

11

of motion testing, there was no objective spasm of the neck or
shoulder muscles. (Tr. 113) In Dr. Tacci's opinion, the decreased
range of motion was solely due to subjectively reported neck
pain. (Tr. 113) The lumbar spine showed full flexion, extension,
lateral flexion, and full rotary movement bilaterally. (Tr. 113)
Range of motion of right shoulder was "completely normal
throughout." (Tr. 113) There was a decreased range of motion in
the left shoulder secondary to subjectively noted left shoulder
pain.  Forward elevation of the left shoulder was limited to 120
degrees.  Abduction was normal as was internal rotation.
External rotation was limited on the left to 75 degrees.  Range
of motion of elbows, forearms, and wrists were completely normal
bilaterally.  Range of motion of hips, right knee, and ankles
were also normal.  Left knee revealed a scar consistent with a
history of trauma.  It also showed a decreased range of motion in
flexion and extension.  Left knee flexion extension was limited
to 130 degrees.

Dr. Tacci found plaintiff to have subjective neck pain,
subjective headaches which plaintiff related to neck pain,
bilateral upper extremity dysfunction, possibly secondary to
cervical radiculopathy, possibly secondary to peripheral
neuropathy or peripheral compression syndrome. (Tr. 114) Dr.
Tacci opined that based on the guidelines set forth by the New
York State Division of Disability Determination, plaintiff would

12

have a "mild degree of limitation."  (Tr. 114) While plaintiff
may have difficulty with frequent, repetitive, ergonomically
awkward, forceful overhead upper extremity tasks, she otherwise
did not have any "significant degree of limitation with any and
all other usual and customary tasks." (Tr. 114) Specifically, Dr.
Tacci noted that plaintiff would have no limitation with respect
to most other lower extremity tasks, tasks performed while
sitting or other usual and customary upper and lower extremity
tasks.

A Physical Residual Functional Capacity Assessment report
completed on January 16, 2003, found that plaintiff was limited
to occasionally lifting or carrying 20 pounds, frequently lifting
or carrying 10 pounds, standing or walking a total of 6 hours in
an 8 hour work day, sit for a total of 6 hours in an 8 hour work
day and was unlimited in her ability to push or pull. (Tr. 116)
Plaintiff had no postural, visual, or communicative limits. (Tr.
117-118)

A medical report completed by Dr. Thomson on October 24,
2003 noted that plaintiff was experiencing headaches going up and
down stairs, and that the numbness of all her fingers in both
hands continued. (Tr. 145) An examination revealed normal
flexion, limited extension to 10 degrees, right rotation limited
to 30 degrees and left rotation was limited to 20 degrees. (Tr.
145) She had tenderness in the C2 through the C6 region. (Tr.

13

145) Dr. Thomson opined that plaintiff had a permanent total disability based on pain and headaches. (Tr. 145)

Dr. Thomson completed a Medical Assessment Form for Reilly on April 13, 2004 in which he found plaintiff to be limited to lifting or carrying five pounds occasionally but no weight frequently. (Tr. 140) He noted that Reilly had a limited range of motion of her neck and reduced strength in both arms.  In addition, he limited he ability to stand to two hours in an eight hour work day and only 15 minutes of standing uninterrupted. (Tr. 140) Thomson based this assessment on plaintiff's pain with neck movement and limited range of motion of her neck as well as the complaints from Reilly that she experienced neck pain and dizziness when standing in lines. (Tr. 140) Based also on plaintiff's own reports, Dr. Thomson limited plaintiff's ability to sit to two hours in an eight hour work day and only 30 minutes uninterrupted. (Tr. 141) He further found that plaintiff should never climb, balance, stoop or crawl. (Tr. 141) He opined that plaintiff could occasionally crouch or kneel.  Dr. Thomson also found that based on plaintiff's claims of strength and sensory reductions, her ability to reach, handle, feel and push and pull are affected. (Tr. 141) Finally, Dr. Thomson found that plaintiff needed environmental restrictions such as heights, moving, chemicals and vibrations because they affect plaintiff's balance. (Tr. 142)

14

Dr. Thomson described plaintiff's daily activities as limited by her pain.  He noted that plaintiff vaccuumed upright in small periods of time to accommodate her pain.  She would need to take a break after lifting five pounds and needs to read in a position leaning forward. (Tr. 143) Reilly claimed that driving as long as 30 minutes cased her a headache. (Tr. 143) Reilly was taking Xanax, Maxair, Nasacort, Cariting and Zyprexa and using a TENS Unit as directed. (Tr. 143) Upon examination, plaintiff experienced tenderness over the spine at C2, C3, C4, C5 and C6 but had no swelling nor spasm.  Her flexion decreased at 45 degrees.  Extension decreased at 5 degrees with pain.  Right rotation decreased at 45 degrees with pain.  Left rotation decreased at 30 degrees with pain.  The lower back appeared to be in no pain. (Tr. 143) On April 9,2004, Dr. Thomson concluded that plaintiff was in chronic persistent pain since her motor vehicle accident and that she was totally permanently disabled.  However, he did note that her strength testing was "suspect" with "give-away noted on testing." (Tr. 143)

B.   <u>Non-Medical Background</u>

At the time of the hearing, plaintiff was relying on social services and had not worked since February, 2001. (Tr. 166) She last worked at Catalyst Direct for eleven dollars an hour as an outside sales person. (Tr. 167) As part of her duties for this job, plaintiff called on potential customers inquiring about

purchased engineering equipment and generate sales by updating
their equipment. (Tr. 167) Reilly used the computer and telephone
for this work.

Prior to working in sales, plaintiff worked in a collections
department for Rochester Gas and Electric Company. (Tr. 168) As
part of her responsibilities in this job, Reilly was trained on
different computer programs and spoke on the telephone with
customers. (Tr. 168) Plaintiff also held a job as a leasing agent
for a real estate company. (Tr. 169)

When asked what prevents her from working at the time of the
hearing, plaintiff stated that she could not walk even a city
block, could not lift even five pounds, can only stand five
minutes at a time, pain in her neck and headaches. (Tr. 172-174)
Plaintiff testified that she takes Xanax, Celebrex and uses her
TENS Unit every day. (Tr. 174-175) She also testified that she
could not perform her prior work because she could not turn her
neck adequately nor had feeling in her fingers to use a computer
keyboard. (Tr. 186)

Reilly lived by herself in a one floor apartment. (Tr. 177)
She occupied herself during the day reading and watching
television. (Tr. 177-78) Reilly cooked for herself and was able
to drive herself to the grocery store and her doctors'
appointments. (Tr. 178) Reilly clarified that she only cooked
simple items that did not involve much chopping or preparation.

16

(Tr. 188-89) Similarly, her ability to vacuum was limited to five minutes at a time to prevent headaches. (Tr. 189) Plaintiff testified that she still experienced headaches which were precipitated by activity and stiffness in her neck. (Tr. 184)

A vocational expert, Dr. Paul Anderson, testified at the hearing. (Tr. 191-193) He summarized plaintiff's vocational history as a telephone sales representative, sedentary level of work and a leasing agent, light exertional level of work. (Tr. 191) Given the hypothetical that plaintiff were limited to occasionally lifting up to 15 pounds or frequently lifting 10 pounds or less and that she could stand or walk for no more than two hours in an eight hour day with no restriction on sitting during the day and no use of the arms above shoulder level and only occasional pushing or pulling with no requirement to maintain specific position of the neck for extended periods of time, Dr. Anderson opined that plaintiff could perform the telephone sales representative jobs. (Tr. 192) Given the hypothetical that plaintiff's abilities were as she had testified at the hearing, Dr. Anderson opined that plaintiff could not perform any jobs. (Tr. 192) When given the hypothetical that plaintiff were as stated by Dr. Thomson's medical report dated April 13, 2004, Dr. Anderson opined that there would be no competitive employment available to plaintiff because sitting and standing and walking were limited to four hours in an eight hour

17

day. (Tr. 193)

## DISCUSSION

Pursuant to 42 U.S.C. § 405(g), the factual findings of the Commissioner are conclusive when they are supported by substantial evidence. Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980). A disability is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the Act unless it is:

> of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(2)(A), 1383(a)(3)(B). Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

In evaluating disability claims, the Commissioner is required to use the five step process promulgated in 20 C.F.R. §§ 404.1520 and 416.920. First, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. Second, if the claimant is not so engaged, the Commissioner must determine whether the claimant has a "severe impairment" which significantly limits his ability to work. Third, if the claimant does suffer such an impairment, the Commissioner must determine whether it corresponds with one of

18

the conditions presumed to be a disability by the Social Security
Commission.  If it does, then no further inquiry is made as to
age, education or experience and the claimant is presumed to be
disabled.  If the impairment is not the equivalent of a condition
on the list, the fourth inquiry is whether the claimant is
nevertheless able to perform her past work.  If she is not, the
fifth and final inquiry is whether the claimant can perform any
other work.  The burden of proving the first four elements is on
the claimant, while the burden of proving the fifth element is on
the Commissioner.  Bush v. Shalala, 94 F.3d 40, 44-45 (2d Cir.
1996).

Here, the ALJ followed the five step procedure.  In his
decision dated June 14, 2004, the ALJ found that plaintiff (1)
had not engaged in substantial gainful activity since the onset
date of January 25, 2001; (2)suffers from back and neck pain as
well as headaches; (3) did not have an impairment that meets or
equals one of the listed impairments listed in Appendix 1,
subpart P, Regulation No. 4; and (4) did have the residual
functional capacity to perform her past relevant work. (Tr. 14-
23)

In reaching this decision, the ALJ did not find plaintiff's
claim of disabling effects from her impairments to be credible.
(Tr. 21-22)  The ALJ noted that diagnostic testing did not show
herniated discs or compression of plaintiff's spinal cord. (Tr.

20) He also pointed to the lack of support from nerve conducting testing which did not show radiculaopathy or neuropathy that would account for her allegations of numbness in her arms. (Tr. 22) Medical examinations indicated normal strength in plaintiff's upper and lower extremities bilaterally.  The ALJ did concede that plaintiff suffered a whiplash injury during the motor vehicle accident which would be expected to cause some pain. However, the ALJ found no objective medical evidence to support the claim of an impairment that could "reasonably be expected to produce the pain alleged." (Tr. 22)

The ALJ found plaintiff's statements regarding her restrictions of daily living to be only partially credible. (Tr. 22) For example, the ALJ noted that plaintiff had told Dr. Tacci that she was able to cook meals, clean her home, do laundry, shop for food or clothing, shower and dress herself yet she testified that she was unable to complete these tasks.

Plaintiff argues that the ALJ improperly relied on the opinion of the non-treating physician Dr. Medved in contravention of the treating physician rule.  The ALJ properly failed to give controlling weight to the opinion of plaintiff's treating physician, Dr. Thomson.

> Generally, we give more weight to opinions from your
> treating sources . . . If we find that a treating source's
> opinion on the issue(s) of the nature and severity of your
> impairment(s) is well supported by medically acceptable
> clinical and laboratory diagnostic techniques and is not
> inconsistent with the other substantial evidence in your

20

> case record, we will give it controlling weight.  When we do
> not give the treating source's opinion controlling weight,
> we apply the factors listed below as well as the factors in
> paragraphs(d)(3) through (5) of this section in determining
> the weight to give the opinion.  We will always give good
> reasons in our notice of determination or decision for the
> weight we give your treating source's opinion.

20 C.F.R. § 404.1527(d)(2).

The opinions of treating sources are entitled to controlling
weight if they are well supported and not contradicted. 20 C.F.R.
§§ 404.1527 and 416.927.  In assessing plaintiff's residual
functional capacity, the ALJ set forth "good reasons" for
disregarding the opinion of plaintiff's treating physician.  The
ALJ noted that Dr. Thomson's treatment contain numerous
references to subjective pain but little reference to clinically
significant objective findings. (Tr. 21) The ALJ found Dr.
Thomson's opinion as to plaintiff's condition to be "conclusory"
and only based on plaintiff's subjective complaints. (Tr. 21) In
addition, the ALJ noted that Dr. Thomson's opinions as to
disability were not supported by medically acceptable laboratory
and diagnostic techniques.

Plaintiff argues that Dr. Medved actually provides
objective medical findings to support her disability claim.  Dr.
Medved observed some limitation in plaintiff's range of motion of
the neck and shoulder and decreased right hand grip.  However,
based on these observations, Dr. Medved did not find that
plaintiff was totally disabled and in fact specifically found

21

that plaintiff could perform the duties required at her former employer.

Similarly, the ALJ found plaintiff to be partially disabled but able to perform sedentary work.  The ALJ relied on the medical records to find that plaintiff was limited to lifting 15 pounds occasionally with frequent lifting up to 10 pounds. (Tr. 21) Further, the ALJ found that the record did support plaintiff to be limited to standing and walking no more than two hours in an eight hour work day. (Tr. 21) He concluded that plaintiff had the residual functional capacity to perform a limited range of sedentary work.  This finding is supported by medical opinions in the record as well as clinical and diagnostic findings. (Tr. 105, 143, 148)

Dr. Thomson himself acknowledged in his report that his opinion that plaintiff could sit for only two hours per day and 30 minutes at one time was based on plaintiff's self "report" of "pain with sitting upright." (Tr. 141) Dr. Thomson's opinion that plaintiff was totally disabled was contrary to both the objective medical evidence as well as the opinions of Dr. Medved and Dr. Tacci. (Tr. 17-18, 99-106)  Dr. Medved maintained that Reilly did have a partial disability and that her reported symptoms and complaints were "out of proportion to the nature of the motor vehicle accident and the objective findings". (Tr. 100) Similarly, Dr. Tacci found that plaintiff's limitations were

22

based on "subjective" neck pain and could find no objective
medical evidence to substantiate plaintiff's claims. (Tr. Tr.
113-114)

<u>CONCLUSION</u>

This Court finds that there is substantial evidence in the
record to support the ALJ's conclusion that plaintiff is not
disabled within the meaning of the Social Security Act.
Accordingly, the Commissioner's motion for judgment on the
pleadings is granted and the Complaint is dismissed.


ALL OF THE ABOVE IS SO ORDERED.

S/ Michael A. Telesca

_____
   MICHAEL A. TELESCA
United States District Judge

DATED:     Rochester, New York
           January 20, 2006